629 So.2d 449 (1993)
David FUTRELL, Plaintiff-Appellee,
v.
SCOTT TRUCK AND TRACTOR COMPANY OF LOUISIANA, INC., et al., Defendants-Appellants.
No. 93-88.
Court of Appeal of Louisiana, Third Circuit.
December 8, 1993.
Rehearing Denied January 5, 1994.
*452 Christopher J. Roy, Christopher J. Roy, Jr., Alexandria, for David Futrell.
Mary M. Hamilton and William M. Bass, Lafayette, for Omark Industries.
Before YELVERTON, KNOLL and THIBODEAUX, JJ.
KNOLL, Judge.
This is a products liability case involving the collapse of a 210-B log loader while it was in operation, and designed and manufactured by Omark Industries, Inc. A jury found the 210-B log loader defective in design and manufacture, that Omark was totally at fault in causing the accident, and awarded David Futrell, the injured worker, damages in the amount of $1,245,000.
At a rule to show cause subsequent to the jury trial, the trial court fixed Futrell's past medical expenses at $41,958.50 and amended an agreement between Futrell and Omark on the accrual of judicial interest.
Omark appeals, contending that: (1) the trial court abused its discretion in prohibiting its expert metallurgical engineer, Tom Proft, to testify; (2) the trial court abused its discretion in not allowing Omark to disclose to the jury all factual material about the expert testimony of Maxwell Dow; (3) the trial court's jury instructions failed to fairly and reasonably point up all issues raised in the litigation and did not provide correct legal principles applicable to the case; (4) the jury's allocation of fault was clearly erroneous; (5) the jury's damage award of $1,245,000 was an abuse of discretion; (6) the trial court's award of future medical expenses was clearly wrong; and, (7) the trial court erred in varying the award of judicial interest from that stated in the motion for continuance Futrell filed on February 21, 1989.

FACTS
Futrell was injured on September 17, 1985, while he operated the loader in the course of his employment with Hunt Plywood Company, Inc. (Hunt). At the time of the accident, Scott Truck and Tractor Company of Louisiana, Inc. (Scott) owned the loader and had leased it to Hunt approximately one month prior to the accident.
The log loader has an enclosed cab for the operator and a boom assembly mounted on a turntable. Cap screws and bolts are used to attach the turntable to the bearing assembly and allows 360 degree rotation. There is an outer circular ring of 30 cap screws and an inner ring of 30 bolts. The bearing assembly is mounted on a subframe and the entire unit is mounted on a truck manufactured by others. It is undisputed that the accident was caused by inner ring bolt fatigue and failure. On the date of the accident, the fatigued inner ring bolts failed while the loader was lifting a log, causing the turntable to separate from the bearing assembly and fall over. Futrell was injured when he was thrown around in the cab. For reference, we have appended P-8 to this opinion which is a photocopy of a diagram of the loader at issue.
Initially, Dr. John Weiss, an orthopedist, treated Futrell conservatively for an injured lower back. Ultimately, Futrell underwent *453 chemonucleolysis and a partial laminectomy performed by Dr. Weiss at the L4-5 level. Because Futrell still suffered significant pain after these surgeries, Dr. John Jackson, a neurosurgeon, performed a lumbar fusion at the L4-5 level. As of the time of trial, Futrell had not been able to return to work.
Futrell first sued Scott and Omark and Scott's insurer. Lumbermen's Mutual Alliance (Lumbermen's), Hunt's worker's compensation carrier, intervened, seeking reimbursement of medical expenses and worker's compensation benefits paid.
Before trial, Futrell settled with Scott and Hunt and their respective insurers. As a result of the settlement, Futrell dismissed his claims against Scott, Hunt, and their insurers, and Lumbermen's and Hunt dismissed their claims against Omark. Futrell specifically reserved his claims against Omark.
Omark brings this appeal.

EXCLUSION OF EXPERT WITNESS TESTIMONY
Omark contends that the trial court erred in its ruling that its expert metallurgist, Tom Proft, could not testify. It argues that the trial court incorrectly concluded that Omark failed to properly amend its pre-trial memorandum to list Proft as a witness, and that Futrell was denied an opportunity to depose Proft.
The first objection to the trial court's ruling is Omark's contention that it properly complied with the pre-trial procedure. For reasons which follow, we find that Omark complied with the pre-trial procedure and that the trial court's ruling was manifestly erroneous.
Inherent in the theory of pre-trial procedure are the orderly disposition of each case and of the entire docket and the avoidance of surprise. Eanes v. McKnight, 262 La. 915, 265 So.2d 220 (1972). These are sufficient reasons for allowing the trial judge to require adherence to the pre-trial order in the conduct of the action. Id.
Our review of the record shows that the litigants filed numerous pre-trial memoranda which stated facts and applicable law and detailed the witnesses each wished to call. However, at no time does the record establish that the trial court held a pre-trial conference in accordance with LSA-C.C.P. Art. 1551 or that it issued a pre-trial order. Accordingly, we do not find that we are presented with an issue of whether Omark complied with a formal pre-trial order of the trial court. Instead, we are presented with a general question of whether the trial court abused its broad discretion in the exclusion of witness testimony.
The trial judge has discretion in conducting a trial. Combs v. Hartford Ins. Co., 544 So.2d 583 (La.App. 1st Cir.1989), writ denied, 550 So.2d 630 (La.1989). The trial judge is required to conduct a trial in an orderly, expeditious manner and to control the proceedings so that justice is done. LSA-C.C.P. Art. 1631. The trial judge's discretion includes the determination of the admissibility of a witness's testimony. Id.
In the case sub judice, the record shows that Omark first listed Tom Proft as a witness on its pre-trial memorandum on February 25, 1991; it again appears on an amended pre-trial memorandum dated January 8, 1992. Trial of this case began on January 14, 1992. In addition, counsel for Omark sent counsel for Futrell a letter on December 6, 1991, which outlined general information Proft had given about the bolts in question. The letter further stated, "In the event that you need any additional information from Tom Proft, let me know. I will go ahead and list him as a witness and make arrangements for him to come to trial ... In the event that you want to take Tom Proft's deposition, let me know and we can also schedule that." Thus, it is clear that Futrell knew of Proft well in advance of trial; first, in a pre-trial memorandum and then later by letter. Based on this information, we find that the trial court erred in excluding Proft's testimony on these grounds.
Nevertheless, after carefully reviewing the record, we find that the exclusion of Proft's testimony was harmless error.
The jury heard the testimony of four experts: William Koon, Omark's division chief engineer for the design and development of *454 the 210-B log loader; Maxwell Dow, a mechanical engineer with a subspecialty in the forensic application of mechanical engineering; Theodore Coleman, Omark's design engineer; and, Dr. Leighton Sissom, a mechanical engineer. Only Dr. Sissom testified on behalf of Futrell.
The proffered testimony of Proft shows that he would have testified as follows: (1) He had previously been involved in the analysis of hundreds of bolt failures and had examined 28 of the 30 inner ring bolts from the accident loader under both conventional and electron microscopes; (2) Eight inner ring bolts had progressively cracked by fatigue prior to the accident, a result of improper maintenance; (3) The fatigue cracking was a result of failure to retorque the inner ring bolts in accordance with instructions in the Prentice Owners Manual; (4) The loss of torque could not have been prevented by the use of lock nuts, dowel pins or other thread locking mechanisms; (5) The heads of the failed inner ring bolts showed that they had cracked and loosened such that they were dragging across the sub-frame of the loader for an extended period of time prior to the accident; (6) The popping noise heard by Futrell prior to the accident was related to the loose inner ring bolts; (7) The lack of outer ring capscrew failures on the loader indicated that it was not one of the units that had an uneven mounting ring; and, (8) If Scott service personnel had checked the inner ring bolts when the loader was still in Scott's possession, or on the two occasions that they were called out by Hunt to repair the loader, they would have located the loose inner ring bolts that were broken by fatigue, rectified the condition and prevented the accident.
After carefully reviewing the testimony of the various experts, we find that they all basically agreed that the accident occurred when inner ring bolts experienced fatigue failure and, in turn, precipitated the accident when increased stress on the remainder of the non-fatigued bolts caused rapid failure of them. The disagreement between Futrell's expert and Omark's experts centered on the cause of the inner bolt failure. Omark's contention was that either Scott or Hunt failed to inspect and maintain the loader. Futrell's contention was that the loader was defective in design and manufacture.
If we compare Proft's proffered testimony on the essential issue of causation to the testimony presented to the jury, we find that it does not interject any substantive opinion which differed from that already in the record. Even though he would have been the only metallurgist to testify, we do not find that this type of testimony was essential to Omark's defense. Accordingly, we find no prejudicial error in the trial court's exclusion of Proft's testimony before the jury that would require a reversal.

DOW'S DEPOSITIONAL TESTIMONY
Omark contends that the trial court erred by prohibiting its disclosure to the jury that Scott had retained Maxwell Dow as its expert and that Scott provided him with all information used as the basis for his expert opinion. It argues that the jury should have been given this information so that it could properly weigh Dow's testimony and evaluate any possible bias or lack of bias he may have in formulating his opinion.
Initially, Futrell contends that Omark is precluded from raising this issue since it was rejected in a writ ruling from this court prior to trial. In support of his contention, Futrell raises the doctrine of "law of the case." See, Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 256 So.2d 105 (1971). We agree.
In our pre-trial writ ruling we were asked to address the propriety of the trial court's decision to exclude reference in voir dire and counsel's opening statement to Dow's earlier employment by Scott. After thoroughly reviewing the issue, we found no abuse in the trial court's ruling.
Omark now attempts to distinguish our earlier ruling on the basis that the question now presented is whether the trial court erred in further excluding reference to Scott's employment of Dow during the reading of his deposition at trial. We fail to see the distinction that Omark urges. Reference to Dow in voir dire and opening statements cannot be viewed in isolation. In fact the *455 only reason in which the Dow/Scott relationship could have been referred to in the pre-evidentiary stage would have been in anticipation of an elaboration upon that relationship which the jury would have heard in the reading of this expert's deposition. Accordingly, we agree with Futrell's contention that the doctrine of the law of the case precludes us from revisiting our earlier determination.
Notwithstanding our ruling, we further find that at numerous times during the reading of Dow's deposition, the jury was alerted to the fact that Dow was employed by Elizabeth Foote, an attorney who was no longer currently active in the litigation before the jury. Moreover, at one point in the deposition, Dow refers to the fact that he should hold on to his work since there has been a tentative settlement reached which involved Foote's client. Accordingly, even if the trial court's ruling was erroneous, we do not find that Omark was prejudiced since Dow's association with Foote was stated.

JURY INSTRUCTIONS
Omark contends that the trial court erred in refusing to incorporate specific jury instructions on intervening cause and duty to warn. More generally, Omark contends that the trial court's jury instructions failed to fairly and reasonably reflect the issues presented and to instruct on the principles of law applicable to this products liability case.
Adequate jury instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. The adequacy of jury instructions must be determined in light of the jury instructions as a whole. Kaplan v. Missouri-Pacific Railroad Co., 409 So.2d 298 (La.App. 3rd Cir.1981). The trial court is under no obligation to give any specific jury instructions that may be submitted by either party; it must, however, correctly charge the jury. Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3rd Cir.1991). An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were prejudicial. Id.
Omark contends that the jury instructions omitted any instruction on Scott's intervening/superseding negligence. We have carefully examined Omark's objection and the trial court's jury charge with respect to this issue and find the instructions adequate. The trial court explained to the jury that Omark was not responsible for Futrell's damages "if someone else fails to give a user or handler of the product an adequate warning that the manufacturer has provided about the product." Furthermore, the trial court additionally instructed the jury to apportion liability to Scott to its degree of fault if it finds that Scott was informed of the defective bolts and failed to warn Hunt and further failed to inspect/repair the bolts. Moreover, consistent with these instructions, the jury verdict form specifically asked the jury if Scott was negligent and was structured so that the jury could assess any percentage of fault to Scott it deemed warranted by the evidence.
We likewise find no error in the trial court's refusal to utilize Omark's jury instruction number four. This instruction is based on LSA-R.S. 9:2800.53(8) which was enacted into law on September 1, 1988. This accident occurred almost three years before the enactment of R.S. 9:2800.53(8). Being substantive in nature, see, Gilboy v. American Tobacco Co., 582 So.2d 1263 (La.1991), we find that the trial court properly excluded the charge since the Louisiana Products Liability Act can have only prospective application.
Lastly, Omark generally states that the jury instructions failed to fairly and reasonably reflect the issues presented and to instruct on the principles of law applicable to this products liability case. It is well established that a party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires or immediately after the jury retires. The record shows that counsel for Futrell and Omark labored over the jury instructions for approximately four hours. After the trial court instructed the jury, Omark objected only on the specific grounds stated hereinabove. In the absence of any other stated objection recorded in the *456 transcript to the jury instruction, we find that no further defect alleged by Omark has been preserved for appellate review.

JURY'S ALLOCATION OF FAULT
Omark contends that the jury was manifestly erroneous in its conclusion that Scott was free from fault for Futrell's accident and injury.
A trier of fact's finding as to the percentage of fault is a factual determination and must be upheld on appellate review unless it is clearly wrong. Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967 (La.1985).
At trial, Omark contended that Scott failed to maintain or repair the loader leased to Hunt and further failed to advise Hunt to regularly inspect the inner ring bolts for fatigue or failure.
After reviewing the record before us, we find that this case presents a classic example of the manifest error rule. The jury was presented with conflicting evidence on both points raised herein by Omark. Hunt's employees testified that they did not recall receiving warnings from Scott; certainly, the jury could have concluded that such warnings were forthcoming from Scott. Likewise, with regard to Scott's inspection of the inner ring bolts the testimony is that its employees checked the loader prior to leasing the loader and that its repair personnel checked for loose bolts when they made service calls on two occasions at the Hunt facility. In light of the conflicting evidence on these issues, we cannot say that the jury was clearly wrong in absolving Scott of liability for this accident.

DAMAGE AWARD
Omark contends that the jury award of $1,245,000 is an abuse of discretion and is not supported by the record. Omark argues that the jury's award of: (1) $450,000 for general damages was excessive; (2) $25,000 for scarring and disfigurement was unsupported by the record; (3) $30,000 for future medical expenses was unsupported by the record; (4) $140,000 for past loss of earnings was excessive; (5) $600,000 for future loss of earnings and loss of earning capacity was speculative and not supported by the evidence.
Futrell, who was 28 years of age at the time of this accident, sustained a back injury when he was jostled in the cab of the loader. Two days after the accident, on September 19, 1985, Futrell consulted Dr. John Weiss, an orthopedist. Dr. Weiss treated Futrell conservatively for a suspected herniated disc at L4-5. Ultimately, Dr. Weiss determined that conservative treatment was not relieving Futrell.
On January 24, 1986, Dr. Weiss performed chemonucleolysis, a procedure in which a chemical is injected into the affected disc to dissolve the disc and hopefully release pressure on any impinged nerve roots. This procedure also failed. In April 1986, Dr. Weiss performed a partial laminectomy on Futrell at the L4-5 level along with a foraminotomy on the left at L4-5. Despite Dr. Weiss's surgery, Futrell continued to have persistent pain. Accordingly, Dr. Weiss referred Futrell to Dr. John Jackson, a neurosurgeon who specialized in interbody fusions.
On May 15, 1986, Dr. Jackson confirmed Futrell's herniated disc at L4-5 together with a problematic degenerative and bulging disc at the L5-S1 level. On May 21, Futrell was admitted into Doctor's Hospital and the following day Dr. Jackson performed a two level lumbar interbody fusion at L4-5 and L5-S1. At that time Dr. Jackson placed wire in Futrell's vertebral bodies to fuse them; this resulted in a 20% loss of motion in his back. Even after this procedure, Futrell's pain was not eliminated and swelling of the nerve root caused his ankle reflex to disappear.
Dr. Weiss felt that Futrell reached a maximum achievement from surgery as of June 1988 and that he would need rehabilitation to re-enter the work force. Dr. Weiss further opined that Futrell's pain was chronic and assigned him a 3540% permanent physical impairment and loss of physical function.
Dr. Jackson opined that Futrell was totally disabled as of August 1989 and felt that Futrell sustained a 20% permanent loss of motion in his back. He concluded that Futrell was only capable of doing sedentary, *457 desk job type work. He further opined that even though the surgery was successful, Futrell would nevertheless continue to be in pain from his back injury.
Dr. Jackson further agreed with the psychiatric diagnosis of Dr. Hugh King that Futrell suffered from an adjustment disorder with depression consistent with his injury. Accordingly, he thought that Futrell should continue psychiatric treatment.
Futrell, a manual laborer all his life, testified that he cannot lift anything heavier than 25 pounds. He stated that he is always in pain which causes him to be aggravated and that he regularly experiences numbness of the left foot. He cannot run, climb, jump, or bend, and he stumbles on his left foot. Futrell further stated that pain prevents him from sleeping well and that he takes prescription drugs to help him sleep better. Because of his inactivity, he testified that his weight has increased from approximately 190 pounds to over 250 pounds.
Futrell's wife, Rosemary, testified that this injury has completely changed her husband. He has gone from outgoing and bubbly to quiet and reserved. In addition, Futrell's back injury has limited the things he can physically do with his five year old daughter.
Futrell's mother, Pauline, testified that her son can barely get around and that he cannot do any one thing for more than an hour at a time. She further testified that she has helped her son financially, but that the family could not afford to put him into a rehabilitation program.
General Damages. Omark contends that the jury's award of $450,000 in general damages is excessive.
Before a jury award should be disturbed, the record must clearly reveal that the jury abused its discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976). Further, as enunciated in Reck v. Stevens, 373 So.2d 498 (La.1979), the initial inquiry must always be directed to whether the award for the particular injuries and their effects upon the particular injured person is a clear abuse of the jury's much discretion. Moreover, recently in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), the Louisiana Supreme Court stated that the trier of fact's discretion in the amount of an award of general damages is "great, and even vast, so that an appellate court should rarely disturb ... [such] an award."
In the case sub judice, we find that the record fully supports a finding of permanent disability and permanent pain which was caused by the accident. Omark presented no evidence which contradicted the medical testimony the jury heard. After individualizing this award to this injured plaintiff, we conclude that an award of $450,000 is not excessive.
Scarring. Omark contends that the jury's award of $25,000 for scarring is not supported by the evidence presented. We agree.
Counsel for Futrell has referred us to Chmurka v. Southern Farm Bur. Ins. Co., 357 So.2d 1207 (La.App. 4th Cir.1978), as authority for the jury's surgical scarring award. After reviewing the facts in Chmurka, we find it distinguishable. In Chmurka, a surgical scar, approximately seven and one-half inches on the left hip, was noticeable when the plaintiff, a woman, wore her bathing suit.
In the case sub judice, the record does show that Futrell exhibited the surgical scarring on his back to the jury. However, the length of the scarring is not established in the record other than that Futrell had to lower his pants "down to ... [his] tail bone" to show the scarring to the jury. Based on this evidence, it is clear that Futrell's scarring was the normal consequence of back surgery and was not visible because his clothing covered the affected area.
Accordingly, in the absence of evidence of disfigurement, we reverse the jury award of $25,000 for hidden surgical scarring.
Future Medical Expenses. Omark contends that the jury's award of $30,000 for future medical expenses is not supported by the record.
Future medical expenses must be established with some degree of certainty. *458 The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award. Sikes v. McLean Trucking Co., 383 So.2d 111 (La.App. 3rd Cir.1980).
The record shows that since the accident Futrell has suffered from depression and pain, and that these factors have adversely affected his ability to sleep. Because of this Futrell was under the treatment of a psychiatrist, Dr. Hugh King. Drs. King and Weiss prescribed Elavil and Vistoril for Futrell on a daily basis. Both Dr. Weiss and Dr. Jackson opined that Futrell will never be pain free.
Futrell's wife testified that her husband's prescription costs for the Elavil and Vistoril average $760 per year. Based on Futrell's age of 35 at the time of trial and the medical evidence of his need for medication, we find that the $30,000 awarded by the jury was adequately supported by the record. Accordingly, we find no merit to Omark's assignment of error.
Past Loss of Wages. Omark contends that the jury's award of $140,000 for Futrell's past loss of wages is not supported by the record. It argues that Futrell was released to sedentary work two and one-half years before trial and that the jury could only award for income losses to that time. An award for the past loss of wages is susceptible of mathematical calculation from proof offered at trial and an award for this element of damages is not subject to the much discretion rule. Ammons v. St. Paul Fire & Marine Ins. Co., 525 So.2d 60 (La. App. 3rd Cir.1988), writ denied, 525 So.2d 1045 (La.1988).
The major thrust of Omark's objection is its contention that Drs. Weiss and Jackson released Futrell to do sedentary work well before the time of trial. Although the record shows that Dr. Weiss and Dr. Jackson recommended that Futrell could begin sedentary work before the trial date, both made this recommendation subject to his enrolling in a rehabilitation program and with the restriction that he could only sit at a desk, lifting only a paper or telephone. Omark made no showing in the record that Futrell was able to comply with either condition set by his treating physicians. Moreover, the record reflects that because of a lack of finances, Futrell was unable to enroll in a rehabilitation program which would have enhanced his employability within the conditions placed by the doctors. Accordingly, we find no merit to Omark's contention.
The record shows that at the time of the accident, Futrell was earning $16,598.40 per annum based on an hourly wage of $7.98 for a 40 hour week. A period of approximately 6.33 years elapsed between the date of the accident and the time of trial. Based on these figures the most the jury could have awarded is $105,067.87. The jury awarded $140,000.
Futrell argues in brief that the jury's higher award was based on the testimony of Larry Manthei, Hunt's personnel superintendent, that Futrell's job classification no longer exists and he would have been offered a higher hourly salary ($8.50 to $9.00 per hour) for another superintendent slot at the plant. After carefully reviewing the record, we are unable to justify the jury's higher award since there was no testimony by Manthei of the date on which Futrell would have been eligible for the higher hourly wage. Accordingly, we will amend the jury award to reduce Futrell's loss of wages to $105,067.87.
Future Loss of Wages/Loss of Earning Capacity. Omark contends that Futrell failed to prove that he was entitled to receive $600,000 for the future loss of wage and loss of earning capacity. It argues, like it did earlier on the issue of past loss of wages, that Futrell was able to do sedentary work at the time of trial.
Before a tort victim can recover damages for future loss of wages, he must prove the loss with reasonable certainty. Mistich v. Pipelines, Inc., 609 So.2d 921 (La.App. 4th Cir.1992), writ denied, 613 So.2d 996 (La.1993), cert. denied, ___ U.S. ___, *459 113 S.Ct. 3020, 125 L.Ed.2d 709. However, such damages need not be proven with mathematical certainty. Whatley v. Regional Transit Authority, 563 So.2d 1194 (La.App. 4th Cir.1990), writ denied, 569 So.2d 965 (La.1990).
As pointed out above, Futrell was 35 years of age at the time of trial. His testimony shows that he had worked since high school and had been employed at Hunt since 1981. His work history showed promotions and consistent salary increases. Hunt's plant manager testified that Futrell would have been offered an operator's position with the company if he had not been hurt, and that his starting hourly salary would have been between $8.50 and 9.00.
Omark does not contest Futrell's work record, and the employment projections made by Hunt's manager. Instead, its primary opposition to the jury's $600,000 award is that the jury failed to take into consideration that Futrell could have performed sedentary work in the future. Assuming arguendo that Futrell could have done sedentary work, the record is void of any evidence introduced by Omark to show to what extent the jury should have discounted its award.
Considering the long work history of Futrell, his young age at the time of trial, and the absence of evidence by Omark to discount Futrell's projected potential income, we cannot say that the jury award is excessive.

PAST MEDICAL EXPENSES
Omark contends that since Hunt's worker's compensation insurer paid Futrell's past medical expenses, the trial court should not have awarded Futrell $41,958.50 for the medical expenses he incurred as of the time of trial.
It is undisputed that Lumbermen's paid all of Futrell's medical expenses as of the time of trial. It is likewise shown in the record that Lumbermen's intervened in this law suit, seeking recovery of the medical expenses it paid on Futrell's behalf. Nevertheless, well prior to trial Lumbermen's settled with Futrell and Scott Truck. Accordingly, Futrell dismissed with prejudice all claims he had against Scott Truck and Hunt, and Lumbermen's dismissed its claims against Futrell and Omark. Moreover, in the receipt and release, Futrell specifically reserved all of his rights against Omark.
Omark's contention is that Lumbermen's is the subrogee of Futrell. Thus Lumbermen's dismissal from this law suit precludes Futrell from double recovery of the same medical expenses. We find Omark's contention misplaced.
Instead, we find Richoux v. Grain Dealers Mutual Insurance Co., 175 So.2d 883 (La. App. 3rd Cir.1965), writ denied, 248 La. 366, 178 So.2d 656 (1965), dispositive of the issue. In Richoux, we stated at 892:
"Prior to the trial of the case, Gallagher received from the compensation insurer of his employer the aggregate sum of $2,404.34 as compensation benefits and medical expenses because of the alleged injury, which amount includes a sum of money which was paid by the insurer as a settlement of his claim for additional compensation benefits. The compensation insurer intervened in this suit, demanding that it be reimbursed the amounts paid by it out of the sum which may be recovered from the defendant herein, but that intervention was subsequently dismissed and no such claim is now before us. Defendant contends that it nevertheless is entitled to credit for the compensation benefits which were paid, even though no claim for reimbursement is being made by the compensation insurer.
The applicable rule of law is that in an action in tort by an injured employee against a third party tort feasor, where the liability of the tort feasor is established and the employer does not intervene for reimbursement of compensation benefits paid, the plaintiff is entitled to recover the full amount of the damages sustained by him, without deduction of the amounts which he has received from his employer as compensation benefits. In view of the... established jurisprudence of this state, we conclude that defendant is not entitled to credit for the amount which Gallagher previously had received as compensation benefits." (Citations omitted.) *460 See also, Wallace v. Pan American Fire & Cas. Co., 352 So.2d 1048 (La.App. 3rd Cir. 1977), writ denied, 354 So.2d 209 (La.1978).
The same situation applies herein. Lumbermen's intervention has been dismissed and it is no longer claiming reimbursement from Omark. Furthermore, Futrell preserved his rights to proceed against Omark for these medical expenses by specifically reserving his rights in the receipt and release he confected with Lumbermen's.

JUDICIAL INTEREST
Omark further contends that the trial court erred in varying the award of judicial interest from that stated in the motion for continuance Futrell filed on February 21, 1989.
Futrell's attorney moved for a continuance on February 21, 1989. In the motion, Futrell's counsel asked for a continuance of at least three months and agreed to "suspend the running of interest on any judgment obtained in the case from March 13, 1989, until the case is tried...." In the motion, Futrell's attorney stated that Omark's counsel did not oppose the motion predicated on the suspension of the legal interest. The trial court granted the motion ex parte, without a hearing.
Several weeks prior to July 17, 1990, the next trial date set by court order, Omark moved for and obtained a continuance. Just before the next trial fixing on March 12, 1991, Futrell obtained a continuance and the case was refixed for July 16, 1991. The July trial date was upset because of incomplete discovery and was continued to October 15, 1991. Ultimately, on September 31, 1991, Omark moved for a continuance and the case was rescheduled for January 14, 1992.
Instead of suspending the running of interest from March 13, 1989, until the time of trial, the trial court reinstated judicial interest from the filing of the petition to February 24, 1989, then from July 17, 1990 to March 12, 1991, and finally between October 15, 1991 and January 14, 1992, the date of the beginning of the trial.
Omark argues that the trial court had no discretion to vary the terms of the motion for continuance which Futrell filed on February 21, 1989. Pursuant to those terms, it argues that the trial court could only award judicial interest to March 12, 1989, and not thereafter.
It is clear from the record that the trial court based its award of judicial interest in accordance with the parties' motions for continuance and the intent of Futrell. In particular, we note that Futrell's motion for continuance was made with a request for a minimum delay of three months; on this basis, the trial court first postponed the trial date for only four months. It is likewise clear that the trial court awarded no interest between February 24, 1989, and July 17, 1990, and March 12, 1991, and October 15, 1991, based on Futrell's further motions for continuance. Thereafter, it was only after several mutually agreeable continuances that the trial court reinstated judicial interest when Omark alone moved for the last continuance. Therefore, we find factual support for the trial court's determination of this issue and further find no abuse in the trial court's discretion.
For the foregoing reasons, the judgment of the trial court is reversed in part to delete the jury award for scarring. The judgment of the trial court is further amended to reduce the award for past loss of wages to $105,067.87. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Omark Industries, Inc.
REVERSED IN PART, AMENDED IN PART, AND AFFIRMED AS AMENDED AND RENDERED.
*461